Good morning, your honors. My name is Ben Coleman. I represent the appellant Martel Valencia-Cortez. My plan was to start with the eyewitness identification instruction issue and then hopefully move to the issue related to the expulsion of Mr. Valencia-Cortez from Mexico. Starting with the instructional issue, over the past two decades, there have been significant developments in the field of eyewitness identification. Those developments were set forth exhaustively in Judge McKee's concurring opinion for the Third Circuit in the in-bank decision of Dennis. One of the things that Judge McKee noted was that in 2012, the Supreme Court in Perry v. New Hampshire emphasized the importance of eyewitness identification instructions in protecting a defendant's due process rights. And the Supreme Court, in fact, specifically cited this Court's model jury instruction as one of the types of instructions that help to ensure a defendant's due process rights. What we are asking is for the Court to hold that in a case like this, where eyewitness identification was the crucial issue in the case and where the witness's identifications were subject to many factors that demonstrated unreliability, that a court, upon request by the defendant, is required to give an eyewitness identification instruction. But haven't we already said it's not required? Not on the circumstances of this case. The government has cited a variety of different cases dating back about 25 to 40 years ago, long before Perry and all the developments in eyewitness identification. But in our reply brief, we went through each case. In most of those cases, the district court actually did give an eyewitness identification instruction, and the defendant was merely complaining that he didn't like the language of the instruction or he wanted a little more, something called a tell-fair instruction. You had an expert witness testify here on eyewitness identification. We did, and the district court, as we said in our brief, we commend the district court. We think that was the right decision. Most judges have a difficulty with that. I agree, but that actual testimony supported the instruction. And there would seem to be no reason not to give the instruction in this case. Let me ask you this. Once that testimony was in, the expert's opinions and whatnot, and you have the general credibility instruction where the first number is, you know, you consider the witness's ability to see or recollect, why can't the defense counsel get up and really just argue away about it? Yes, the defense counsel can and did, but both the Supreme Court and this court have said that defense counsel's arguments are not a substitute for a jury instruction. There is an instruction, just not as specific. Correct, not as specific. And I think, you know, first of all, the government tried to attack the credibility of the defense expert, saying he was paid by the defense and he was a smooth-talking professor. But I think it would have been very effective if the defense had 4.11, the model instruction that he requested. He could have ticked through each of those factors. And if you go through each of those factors, each when you apply them to the eyewitness identification instruction in this case, each one he would have had a strong argument. You know, the judge has told you, you should consider this. Well, you know, the capacity to observe the offender. You know, it was night. It was raining. It was foggy. There were poor visibility conditions. You know, whether there were prior misidentifications. Two of the witnesses didn't identify him on the night of the arrest. You know, the lapse of time between the event and the identification. Well, two of the witnesses on the night of the arrest didn't identify him. They didn't identify him until many months later when the Border Patrol came to them and offered them these immigration benefits to identify him. Didn't the expert touch on most of those points? The expert did. Why can't a defense counsel just get up there and tick off each one of those points and say, as the expert testifies. And then the government's position would be, that's a defense-paid expert. They paid him a lot of money to come into court and say things that they wanted him to say, and that was their position. The cases say that, and this is Boyd from the Supreme Court, and we've cited Bernard from this court. Defense counsel's arguments are not a substitute for a jury instruction. Jury instructions have the imprimatur of law. You know, jurors are supposed to follow the instruction. And, in fact, in numerous cases, this court says, we assume jurors follow the instructions, and that's why there was no harm for something. What a defense is entitled to, particularly when this is his theory of the defense, is an instruction that sets forth that theory. And there's no reason not to give the instruction. Well, as prior dialogue indicated, it would be hard for us to simply impose a blanket requirement to give the instruction whenever there's an eyewitness identification in light of our previous cases which bind us. And you responded by saying, well, those don't apply to the circumstances of this case. Can you give us a rule of decision that would give us a line that we can explain why this case is over the line and should be distinguished from prior cases based on that distinction? Yes. And what I would do is refer to the Tenth Circuit's decision in, and I'll get the name of the case, is Tomah. And it's cited at page 21 of our brief. And what the Tenth Circuit said is, When a cautionary instruction on the possible infirmities of eyewitness testimony is requested and not given, on appeal we will focus on the facts of each case to determine whether the instruction was required to fairly present the case to the jury. In particular, we will consider whether identification was a sole or primary issue in the case, whether the evidence consisted mainly of eyewitness identification testimony, and whether the testimony was uncertain, qualified, or suggested a serious question whether the witness had an adequate opportunity to observe. And I would encourage the court to adopt that Tenth Circuit analysis, and when you look at those factors, was identification the sole or primary issue in the case? It was the sole issue in this case, whether the evidence consisted mainly of eyewitness identification testimony. That was essentially it, were those three eyewitnesses, and whether the testimony was uncertain, qualified, or suggested a serious question whether the witness had an adequate opportunity to observe. Here we've got, you know, of the three material witnesses, one didn't identify him and the other two initially didn't identify him, and only did so later when the Border Patrol came to them and offered them the immigration benefits. And the agent identified him using night vision goggles in very poor visibility conditions from a distance. These factors, I think, are, from the Tenth Circuit, are good guiding factors for this court to create a rule. And I think under that rule, the instruction was, should have been given in this case. If there are no other questions on that, then what I'll flip to is the expulsion of Mr. Valencia Cortez from Mexico to the United States. There's really two related issues here. The first is our position that evidence regarding what the Border Patrol did leading up to his expulsion should have been admitted at trial. And then second, that the district court should have held the hearing and ordered discovery on the issue to determine whether dismissal was appropriate or other remedies were appropriate. Taking the evidentiary issue first, what we have here in this case is that Mr. Valencia, after the arrest, we have the Border Patrol disseminating false information through press releases. First, they falsely said that all the aliens on the night in question identified him as the guide. That simply was not true. They also said that he was working for somebody called El Tigre, who was a lieutenant in the Sinaloa cartel. Again, not true, and the government hasn't disputed that. They then, Mr. Valencia submits a declaration saying that he was living at his home in Tijuana, Mexico. Mexican officers barged into his house, basically kidnapped him, threw something over his head, beat him up, and then brought him to the border and turned him over to U.S. Border Patrol. The government has never submitted any type of sworn evidence, any type of declaration refuting any of that, and maybe they will today, I don't know. All they've done is make vague allegations. Just assuming, arguendo, that what you said is true, what kind of relief do you think that entitles you to? I think, number one, it allows that evidence to be presented at trial. Why? How is it relevant? If the agents that are involved in this case are disseminating false information and engaging in fraudulent conduct in order to secure successful prosecution, that is under United States v. Savior. How does that affect the prosecution? It affects the availability of him to prosecute, but I don't understand how it affects the questions that are put to the jury. Well, it affects their bias, it affects their credibility. The agents, the agents who are... The agents, presumably, have that bias to begin with. They're testifying on behalf of the prosecution. They're really motivated. They think this is the guy. How does that change the evidence at trial? Because most jurors think that, well, agents always conduct themselves honorably and honestly, and they tend to believe agents, but if we have... I mean, it almost reminds me of an episode of The Wire, if the court has seen that. If you've got agents who are engaging in underhanded and dishonest behavior because they think the ultimate means are, the ultimate ends are correct, that they think this is the guilty guy, but they're going to do whatever it takes, lie, cheat, not go through the proper procedures in order to prosecute this individual, that shows that you've got dirty cops. You've got cops that are not believable, and that's what Savior says. How does it make it less likely that the perpetrator actually did it or that this is the guy? Because we have a situation here where they are taking, number one, they're taking witnesses, offering them benefits to change their original version, which was that they didn't identify Mr. Valencia as the guy. But that came out of trial. That did, but not their dishonest behavior. And the defense had at the witnesses on the benefits  and that sort of thing. So I don't understand how the circumstances of apprehension in Mexico would have made, would have been relevant at the trial. Well, but they weren't able to have at it at the government agents and that they disseminated false information about Mr. Valencia Cortez that they engaged in this procedure where, in contravention of the U.S.-Mexico extradition treaty and required procedures, they had Mr. Valencia abducted illegally in Mexico and brought to the United States. I mean, that's underhanded. And I still don't understand how that makes it less likely he was guilty. I mean, why is it relevant to the issues posed at trial? Well, if the jury thinks that the prosecution and the agent who claims that he saw Mr. Valencia using night vision goggles from, you know, 30 feet with rain and wind and everything else, I mean, they could doubt the credibility of those officers. Is there any other explanation for the agent's motivation other than that the agent is convinced that this is the guilty party? Well, I mean, there's also, he randomly starts shooting in the air in violation of border patrol protocol, and he needs to find someone, a guilty party. You mentioned the wire. The TV is constantly showing cops that really think they got the guy and will cross all the lines to get him. And there are reasons we enforce the law and try to enforce those lines, but I'm not sure the fact that the cop is really motivated, is convinced that this is the guy, helps to disprove this is the guy. And that's the potential relevance here I'm having trouble understanding. Well, I mean, it's, and again, part of that comes down to one of the problems with eyewitness identification is that once a witness thinks they've identified the guy, they just bury down no matter what and insist that that is the guy when oftentimes they are wrong. But if this is an agent and other agents who are willing to manipulate the evidence, to falsely describe the evidence in an effort to prosecute this one individual, you would think that perhaps their testimony is not believable. I mean, that's what, I mean, that's standard impeachment evidence. If someone has made false statements about a particular incident on a prior occasion, you get to impeach the witness with those false allegations and the jury can credit, can look at that evidence, look at that impeachment and decide, do I believe this agent? Do I believe the government's case? Or do I not believe the government's case? That's standard impeachment. And that's what this court said in Sager, that's what the Supreme Court said in Kiles, which was cited in Sager. Did you want to say something? Yes, thank you. Good morning. May it please the court, Nicole Reese Fox of the United States. I'll just pick up where counsel just left off about the defense's ability to impeach the witnesses about the press releases. And I think it got overlooked in the briefing, but as your honor noted, the defense did question them. And Agent Metz, who is the supervisor, said, I had nothing to do with the press releases. They were asked about their motivation. Agent Parco was asked repeatedly, well, didn't you only identify him because you were motivated to get this guy because you were targeting this guy? Valencia himself testified they were out to get me. So this biased defense was permitted. What wasn't permitted was this extraneous evidence about what happened to the defendant in Mexico. And as your honors have picked up on, we don't think there was any relevance in the district court properly exercise its discretion in excluding that evidence. Well, if in fact they could demonstrate or offer evidence that suggests that a given agent is willing to cross the lines, is willing to make false statements to accomplish his goal, doesn't that support an inference that this guy will say anything? He's convinced this is a defendant, so he'll testify in whatever way he needs to to get that result. So maybe I, as a juror, should discount his testimony. Absolutely. That's classic impeachment evidence. And that was the exact impeachment that was permitted. The problem was that neither agent had anything to do with these press releases. Neither agent agreed with the defense premise that they were willing to do anything. So they were allowed to ask the questions. Or at least they said they had nothing to do with it. But maybe that's the question the jurors are called upon to question too. Because who else in the office is motivated to do the things that were done? I mean, it's easy to say, well, I didn't have anything to do with it. It must have been somebody else. But nobody else is involved in the case, so maybe he had something to do with it after all. Or at least a juror might so speculate. Well, certainly, Your Honor, we have discovery obligations. And if we had any information to suggest that our testifying witnesses had knowledge about any of the actions that are in the discovery motions, we would have turned that over. Was the question ever answered? Who was responsible for issuing the incorrect or the false press releases? Your Honor, they were not false. There is actually nothing false in the press releases. Opposing counsel consistently says that the press release said that all of the witnesses identified Valencia. That's not in the press release. The press release says witnesses identified him and that's accurate. So there's no false information. There's the El Tigre part that caught my attention. That sounded colorful. I don't know who El Tigre is, but was there anything in the press release that could fairly be described as inaccurate? The agent said it wasn't my doing. Your Honor, my understanding, and this was not developed in the record, my understanding is that the agents had good reason to believe that Mr. Valencia was operating with this smuggling organization and the routes that he covered are the routes sort of owned by El Tigre. And so certainly the agency didn't say we know that this guy is the head of the Sinaloa cartel. It says we have public information that suggests he's affiliated with El Tigre, who's an associate of the Sinaloa cartel. And that the agency's good faith was true. And even if that turned out to be inaccurate, number one, that's not such outrageous misconduct so as to justify dismissing the indictment. Let's say it was blatantly false. Leaving aside, we do have rules to enforce, but the issue I'm raising here is not something so drastic, but why isn't that fair game for raising a question about the credibility of the testimony of the agents on the case? The agents on the case, if they had any involvement with linking the Sinaloa cartel to El Tigre, we would have had that information and we would have produced it in discovery. We proffered on behalf of the case agent that he knew nothing about coordination with Mexico. And the defense actually sought to introduce this press release about El Tigre at trial. And the district court excluded it on three grounds. Relevance, 403 saying that it's actually prejudicial, could be in fact prejudicial to the defendant telling the jury that Border Patrol thinks he's linked to the Sinaloa cartel and that it's cumulative because it's only point is to say Border Patrol really wanted to get this guy. They thought he was a really bad guy. They were willing to insinuate he was doing bad things in order to get him. The agents were cross-examined. They both said we wanted to find whoever the alien smuggler was. Agent Parco said I identified him. I believe it was him. Agent Metz said I briefed my guys about him because we were waiting for him. He's somebody that we have a lot of experience with. And so any implication of bias was aptly raised by the defense. And to then get into these side issues about whether he is or is not linked to the Sinaloa cartel was excluded properly under rule 403. At a minimum, the district court didn't abuse its discretion, having heard all of the pre-trial motions, having heard the defense theory, having heard the cross-examination of the witnesses, in excluding it under rule 403. Let me ask you, just one minor point. The government concedes that the grouping calculation was improperly done, right? Yes, your honor. We do submit that under plain error we have a fairly, I think, decent argument that under prongs three and four, this is not an error that affected his substantial rights or that the court need not exercise its discretion. But we do concede it was an error. Can I just, oh, go ahead. I have questions about the charge, if you want to. No, go ahead. I don't understand why the defendant wasn't in this case entitled to the model code charges. Because, I mean, this is almost as sketchy as eyewitness identifications get. I actually disagree with the premise, because maybe Agent Parko's identification is standing alone. He's in the dark. He's looking through these night vision goggles. But his testimony was corroborated by a number of things. And, as I think your honors noted, during the first part of the argument, this expert came and gave more information than the model instruction would have provided to the jury. Just subtract the pejorative from my hypothetical and explain to me why defense in a case like this, where there were substantial questions concerning the validity of the eyewitness identification wasn't entitled to the charge and wasn't entitled to key closing arguments to a charge as opposed to an expert's testimony. Your honor, this court, like other circuits, leave the determination to the district court's discretion. And I think the district court was within its discretion, knowing the facts of the case, knowing the evidence, and knowing what the expert said, how the expert's testimony came in. It came in over, I think it's 50 pages of transcript. It came in quite strong. The government did not attempt to undermine the scientific basis. And to say that the defense was entitled not only to that substantial expert testimony, but to the court's additional kind of stamp of approval of the science behind it, it was within the court's discretion to say, I think that the jury has been adequately informed. But the court gave her an explanation for not giving the instruction. She pointed to the model instruction commentary. And she said, the jury committee discourages the fact. And I thought, hmm, that's kind of interesting, because under our case law, it just seems to give discretion to the district judge. And when you read, and sure enough, when you read the commentary, it says the committee has recommended against giving of an eyewitness identification instruction, because it believes that the general witness credibility instruction is sufficient. That strikes me as discouraging, to say it believes it recommends against giving it. Are you asking whether... She seems to have pointed to this as the basis for not exercising her favorable discretion. Yes, Your Honor. She also went on to say, and by the way, you're going to get to arguing closing all of the things that your expert said. And I can find the page reference if that would be useful. So I think the district court understood that the expert... As I made the point, the counsel could stand up there and say, well, point to the expert's testimony and all the elements about what the expert testified to as to why you can doubt why eyewitness testimony is not always trustworthy. More than that. But it makes it more compelling if he can point to an instruction as the court instructed you, ladies and gentlemen of the jury. Blah, blah. Well, as Your Honor noted earlier, the court did instruct the jury about witness credibility and gave a specific theory of defense instruction. So there were instructions that defense counsel could and did point to. And I would submit great minds could disagree as to what is stronger. You have a jury instruction that is sort of neutral, just giving the science, the facts. Then you have expert testimony, which is substantially developed and key to the facts. But in this case, it would have been both. And I would just submit that the district court was within its discretion to determine that a defendant in this case, where there is corroborating evidence,  part of the group, that the defendant was not entitled to both. Both the expert's testimony and the judicial stamp of approval on the science it relied on. The question I have on that is one that I think my colleagues have suggested. I'm not sure, and you're speculating too, I look at the comment to the jury instruction and the committee seems to be saying one or the other, but not both. And I don't understand what's wrong with both. I don't think that there would be anything wrong with both if a district court in its discretion thought the eyewitness testimony was shaky enough, or the expert's testimony wasn't enough to alert the jury. The judge presumably thought it was shaky enough to justify allowing an expert, which is, in my experience, which is limited, we don't have that many of these cases, that's more unusual. I've seen more cases with the instruction given than I've seen cases with the expert testifying. And so the district court thought, there's enough question here to allow an expert and I suspect Judge Huff is following the comment and saying, but okay, so I've allowed the expert so we don't need to give the instruction. So I think she's probably driven by the comment and I don't understand the comment. If your honor was inclined to, I guess, overrule that prior case law that the comment is based on, we still have a harmless error argument and I think especially in light of the strength of the expert testimony, any error here in not giving this additional jury instruction was harmless. Can I ask you about the instruction on the assault? Yes, your honor. Was it 111B? Yes. And whether it was correct, likely versus capable? And that's being reviewed for plain error. Yes. How do you read Smith? So Smith is confusing because on the one hand, it says that it uses the likely language, but then when doing a harmless error analysis, it talks in more sort of lesser probabilities, could, capable of. And in a footnote in Smith, the court notes the instruction has been modified to address the error here and gives the model instruction that the court gave in this case which has the capable language. So that is sort of sending mixed messages as to what's a proper standard. So certainly, Smith is not enough to show plain error. Even if this court... Excuse me? Which is the proper standard, likely or capable? I think this court's case law is unclear. I think this court's case law is unclear. So 113, the other federal assault statute, the term... That's the same language, isn't it? I'm thinking of a different issue, I'm sorry. Both cases have used both terms, but I'm sort of lost here. What was the conviction for? What I'm reaching for is where does the dangerous weapon element come in? Does it come in as part of the conviction or come in as part of sentencing? Part of the conviction. An element of the offense is that the defendant used a deadly or dangerous weapon. And the instruction goes on to define a deadly or dangerous weapon by saying that whatever the object is, here it was a rock, is a deadly or dangerous weapon if it is used in a way that is capable of causing death or serious bodily injury. In a case like this, I don't think that the distinction between capable or likely is determinative because this guy threw a softball-shaped rock in the dead of night because this guy threw a softball-shaped rock in the dead of night and it hit the agent in the face. I think that's certainly capable of causing serious bodily injury and I think also likely to. The fact that he aimed well enough to get him in the mouth in the dead of night definitely supports the jury's verdict. But I think whether or not this court thinks that likely or capable is the correct standard, Smith and the other cases interpreting this jury instruction are not clear enough to constitute plain error. Thank you. Thank you. I'd just like to make a few points on the likely versus capable since I didn't address it earlier and then just a couple quick points about identification instruction. With respect to this court, in Smith this court used likely. It has to be likelihood and that's consistent with Fowler, the Supreme Court case. A standard like just capable or possible is just wrong. It needs to be a likelihood standard. So it is plain error based on both Smith and the Supreme Court's decision in Fowler. So it is plain error based on both Smith and the Supreme Court's decision in Fowler. Now, in this case it was prejudicial, the plain error, because the only witness who said to have seen anybody throw the rock because the only witness who said to have seen anybody throw the rock was one of the material witnesses who wasn't even quite sure whether it was Mr. Valencia who did so, said he threw the rock underhanded. And the jury itself rejected the government's position And the jury itself rejected the government's position that the agent suffered any bodily injury whatsoever. So certainly this jury may have found that a deadly weapon wasn't used, So certainly this jury may have found that a deadly weapon wasn't used, that whatever was done was not likely to produce significant body injury as that term is defined. On the eyewitness identification instruction, I think the government's essential position is that it's just totally up to the discretion of the district court. it's just totally up to the discretion of the district court. There are a few things. Number one, the model instructions are obviously not the law of the circuit, nor are the commentary. But the commentary has recently been amended to reflect that the Third Circuit has set up a task force, which is based on Judge McKee's concurring opinion and Dennis, to take a closer look at this. So obviously, the jury instruction committees around the country, Third Circuit, Ninth Circuit, are concerned that what's going on with identification instructions is a problem. There is no reason not to give the instruction. The eyewitness identification testimony was very weak in this case, The eyewitness identification testimony was very weak in this case, particularly as to the assault charge. Parko, the agent, didn't see who threw the rock. There was only one witness who very tentatively identified Mr. Valencia as the person who threw the rock. This is the exact type of case where an instruction should have been given, and it was harmful error. Thank you. Thank you. We appreciate your arguments. That matter is submitted.
judges: Parker, Paez, Clifton